**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**WESLEY SANDLIN**                                           **CIVIL ACTION**

**VERSUS**                                                        **No. 17-10083**

**GRAND ISLE SHIPYARD, INC.**                          **SECTION I**

## ORDER AND REASONS

The Fair Labor Standards Act of 1938 ("FLSA") "mandates the payment of minimum wage and overtime compensation to covered employees." *Citicorp Indus. Credit, Inc. v. Brock*, 483 U.S. 27, 32 (1987) (explaining 28 U.S.C. §§ 206, 207). Plaintiff Wesley Sandlin ("Sandlin") alleges that Grand Isle Shipyard, Inc. ("Grand Isle") violated this foundational FLSA directive, which he now seeks to vindicate.

Before the Court is a motion[1] filed by Sandlin to conditionally certify this case as a collective action under the FLSA. Grand Isle opposes[2] the motion.

## I.

The FLSA provides that an action to recover "unpaid overtime compensation . . . may be maintained against any employer . . . by any one or more employees for and [on] behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). But the FLSA does not define "similarly situated" or otherwise explain how the certification of such collective actions should proceed.

---

[1] R. Doc. No. 40.
[2] R. Doc. No. 50.

There are two main lines of authority that prescribe different methods of determining whether a case may proceed as a collective action pursuant to § 216(b). *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995). The first is known as "two-stage class certification," which was developed in a line of cases starting with *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987), and the second is referred to as "spurious" class certification, as typified by *Shushan v. University of Colorado*, 132 F.R.D. 263 (D. Colo. 1990). Because the two-stage class certification procedure is routinely used by all sections of this Court, the Court finds that the *Lusardi* procedure is appropriate in this case. *See Wellman v. Grand Isle Shipyard, Inc.*, No. 14-831, 2014 WL 5810529, at *1-*3 (E.D. La. Nov. 7, 2014) (Africk, J.).

The Fifth Circuit has explained the typical *Lusardi* procedure:

> Under *Lusardi*, the trial court approaches the 'similarly situated' inquiry via a two-step analysis. The first determination is made at the so-called 'notice stage.' At the notice stage, the district court makes a decision—usually based only on the pleadings and any affidavits which have been submitted—whether notice of the action should be given to potential class members.
>
> Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class. If the district court 'conditionally certifies' the class, putative class members are given notice and the opportunity to 'opt-in.' The action proceeds as a representative action through discovery.

*Mooney*, 54 F.3d at 1213-14 (footnote omitted); *see also Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 518-19 (5th Cir. 2010).

2

The second stage of the *Lusardi* procedure "is typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial." *Mooney*, 54 F.3d at 1214. Only the threshold "notice stage" is implicated by the instant motion.

The notice stage requires "nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Id.* at 1214 n.8 (quoting *Sperling v. Hoffman-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988)). However, "[w]hile the standard at this stage is not particularly stringent, it is by no means automatic." *Lima v. Int'l Catastrophe Solutions, Inc.*, 493 F. Supp. 2d 793, 798 (E.D. La. 2007) (internal quotation marks omitted).

"At the notice stage, the plaintiff bears the burden of making a preliminary factual showing that at least a few similarly situated individuals exist." *Id.* In doing so, "[a] plaintiff need only demonstrate a reasonable basis for the allegation that a class of similarly situated persons may exist." *Id.* "However, at least some evidence beyond unsupported factual assertions of a single decision, policy, or plan should be presented." *Id.*

"[A]n FLSA class determination is appropriate when there is a demonstrated similarity among the individual situations . . . [and] some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice]." *Xavier v. Belfor USA Grp., Inc.*, 585 F. Supp. 2d 873, 877-78 (E.D. La. 2008). That determination is usually made based on "the pleadings and any affidavits which have been submitted." *Mooney*, 54 F.3d at 1214.

In making its determination, the Court must remain "mindful that it, like practicing attorneys, has a responsibility to refrain from stirring up unwarranted litigation." *Lima*, 493 F. Supp. 2d at 799 (quoting *Lentz v. Spanky's Restaurant II, Inc.*, 491 F. Supp. 2d 663 (N.D. Tex. 2007)). "Further, employers should not be unduly burdened by a frivolous fishing expedition conducted by the plaintiff at the employer's expense." *Id.*

## II.

### A.

Sandlin requests that the Court conditionally certify two classes:

- A "Misclassification Class," which Sandlin defines to include "'Life Representatives' who were misclassified from October 2014 through April 2016," and

- An "Off-the-Clock Class," which Sandlin defines to include "'Life Representatives' who were required to work unpaid overtime whenever they worked over 50 hours a week."[3]

As an initial matter, Grand Isle objects to conditional certification of Sandlin's proposed "Off-the-Clock Class" on the ground that Sandlin's complaint "is devoid of any mention of 'off-the-clock' work whatsoever."[4] According to Grand Isle, it "has not been put on notice as to any allegations of 'off-the-clock' work prior to the current [m]otion, and has not had the opportunity to traverse allegations of 'off-the-clock' work through responsive pleadings or discovery."[5] Grand Isle urges the Court

---

[3] R. Doc. No. 42-2, at 6.
[4] R. Doc. No. 50, at 9.
[5] *Id.*

to "hold [Sandlin] to the clear allegations made in his [c]omplaint, and limit any purported class to employees who were allegedly 'misclassified' as 'exempt.'"[6]

Sandlin filed a reply[7] that addressed a number of issues that Grand Isle raised in its opposition.  This failure-to-plead issue was not one of them.

After reviewing Sandlin's complaint, the Court agrees with Grand Isle that Sandlin did not plead factual allegations in his complaint to support his self-styled "Off-the-Clock Class."  Instead, Sandlin's complaint focuses exclusively on the contention that, until May 2016, he and other Life Representatives employed by Grand Isle "were not paid overtime compensation as they were misclassified as salaried exempt."[8]

The Federal Rules of Civil Procedure "contemplate that the pleadings will refer to the occurrences sued upon and give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Matherne v. Cytec Corp.*, No. 00-2937, 2002 WL 506816, at *8 (E.D. La. Mar. 28, 2002) (Engelhardt, J.) (internal quotation marks omitted).  With respect to his proposed "Off-the-Clock Class," Sandlin—who, by the way, has never sought to amend his complaint—did not provide fair notice to Grand Isle.  Indeed, Sandlin has not even attempted to argue otherwise.

The Court concludes that Sandlin "cannot in the instant motion expand the scope of the proposed class beyond that which is contained in [his] [c]omplaint."

---

[6] *Id.*

[7] R. Doc. No. 51.

[8] R. Doc. No. 1, ¶ 13; *see also id.* ¶¶ 15-23 (factual allegations in support of this contention).

*Castillo v. P & R Enters., Inc.*, 517 F. Supp. 2d 440, 446 (D.D.C. 2007). Therefore, the Court will not conditionally certify Sandlin's proposed "Off-the-Clock Class."

**B.**

With respect to Sandlin's proposed "Misclassification Class," Grand Isle concedes Sandlin's core factual allegation: that Grand Isle paid Sandlin and other Life Representatives on a salary basis until the spring of 2016, at which time Grand Isle began paying them on an hourly basis.[9]  "So, given this concession," Grand Isle "really does not have an argument that the policy or practice" that forms the basis of this FLSA case "is purely personal to" Sandlin.  *Dearmond v. Alliance Energy Servs., LLC*, No. 17-2222, 2017 WL 3173553, at *2 (E.D. La. July 26, 2017) (Africk, J.).

Rather, Grand Isle advances two principal arguments why the Court should refuse to conditionally certify this class: (1) Sandlin "has failed to allege with specificity or clarity a clear definition of the purported class," and (2) Sandlin "fails to allege that he is similarly situated to putative class members."[10]  Those arguments are unpersuasive.

Sandlin has offered an unambiguous and detailed definition of his proposed "Misclassification Class": "'Life Representatives' who were misclassified from October 2014 through April 2016."[11]  This definition identifies the Grand Isle policy

---

[9] *See* R. Doc. No. 50, at 8 ("Starting April 29, 2016, life representatives were paid an hourly rate, including overtime for hours worked past forty (40) [hours] in a week." (citing R. Doc. No. 50-2, ¶ 6)).
[10] *Id.* at 4-5.
[11] R. Doc. No. 42-2, at 6.

about which Sandlin complains (classification as exempt from overtime under the FLSA), the group of Grand Isle employees subjected to the policy (Life Representatives), and a time period during which the policy applied to this group of Grand Isle employees (October 2014 through April 2016).  This definition is also consistent with the allegations that Sandlin made in this complaint.[12]  Grand Isle's apparent confusion between Sandlin's proposed "Misclassification Class" definition and Sandlin's suggestion as to the group of Grand Isle employees who should receive notice of this case[13]—the latter of which Sandlin formulated against the backdrop of his request that the Court conditionally certify two classes—will not stand in the way of conditional certification of a "Misclassification Class."

Further, Sandlin's proposed "Misclassification Class" definition—"'Life Representatives' who were misclassified from October 2014 through April 2016"— clearly identifies putative class members who are similarly situated to him.  It does not, as Grand Isle suggests, include Life Representatives who were hired by Grand Isle after Grand Isle began paying its Life Representatives an hourly wage.[14]

---

[12] *See* R. Doc. No. 1, ¶ 13 (describing the affected employees as "Life Representatives[ ] [who] were not paid overtime compensation as they were misclassified as salaried exempt).

[13] *See* R. Doc. No. 42-2, at 10 (Sandlin's memorandum in support of his motion for conditional certification) (proposing that notice of the case should be sent to "[a]ll current and former Life Representatives who worked for Grand Isle Shipyard, Inc. at any location throughout the United States from three years prior to the date of this order to present"); R. Doc. No. 50, at 4 (Grand Isle's opposition to Sandlin's motion for conditional certification) (arguing that Sandlin's proposal as to who should receive notice of the case constitutes a proposed definition of a class).

[14] *See* R. Doc. No. 50, at 8-9.

Grand Isle argues that conditional certification of a "Misclassification Class" consisting of Life Representatives is inappropriate, because "Life [R]epresentatives have a wide range of authority, duties, assignments, work hours, and are paid pursuant to different methods depending upon the specific job to which they are assigned."[15]  In support of this position, Grand Isle references an affidavit executed by Eric Callais ("Callais"), Grand Isle's Corporate Health, Safety and Environmental and Human Resources Director.[16]  Callais supervises the Life Representatives.[17]  The Court rejects this argument.

First, the "policy or practice" at issue in this case is the classification of Life Representatives as "salaried exempt" between October 2014 and April 2016[18]—a "policy or practice" that, again, Grand Isle concedes was in place until the end of April 2016.[19]  With respect to this "policy or practice," Callais' affidavit says nothing.  Rather, Callais only addresses the operation of Grand Isle's *post-April 2016* policy of paying Life Representatives *by the hour*.[20]  Such information is immaterial with respect to Sandlin's proposed "Misclassification Class."

In addition, Grand Isle's fuss over the job duties of Life Representatives is suspect.  Grand Isle points to the job description of a "Life Representative," which it suggests "contains no less than nine essential duties and responsibilities and dozens

---

[15] *Id.* at 7.
[16] R. Doc. No. 50-2.
[17] *Id.* ¶ 3.
[18] R. Doc. No. 1, ¶ 13.
[19] *See supra note* 9 and accompanying text.
[20] *See* R. Doc. No. 50-2, ¶ 6.

of requires competencies."[21]   It then argues that, "[a]t any given time, a [L]ife [R]epresentative may be performing any one of these various tasks mentioned in the [j]ob [d]escription, which makes their job duties and responsibilities dissimilar to each other."[22]

In short, Grand Isle is not disputing that Life Representatives all share the same *slate* of job duties.  Rather, Grand Isle suggests that the mere fact that, on any given day, the tasks performed by any one Life Representative may vary from that of any other renders them dissimilar for purposes of conditional certification.

Yet if the Court accepted Grand Isle's position, then it is hard to imagine *any* group of employees at *any* place of business being able to band together in litigation under the FLSA.  For example, non-management fast-food workers share the same slate of job duties: working the front cash register, working the grill, working the sandwich line, working the drive-through window, et cetera.  However, on any given day, those workers will be assigned to perform different duties from each other. Such daily assignment differences between fast-food workers who share the same slate of job duties, however, do not render them materially dissimilar for FLSA collective action purposes where they are subjected by their employer to the same allegedly unlawful "policy or practice."  *Cf. Prejean v. O'Brien's Response Mgmt., Inc.*, No. 12-1045, 2013 WL 5960674, at *7 (E.D. La. Nov. 6, 2013) (Barbier, J., adopting the report and recommendation of Wilkinson, M.J.) (observing that "the focus" of the "similarly situated" requirement for an FLSA collective action "is on

---

[21] *See* R. Doc. No. 50, at 7 (quoting and discussing R. Doc. No. 40-6).
[22] *See* R. Doc. No. 50, at 7.

whether the employees were impacted by a common policy" and so features such as "[g]eographic commonality" are not required).

Finally, Grand Isle argues that "numerous [L]ife [R]epresentatives . . . have already received notice of this lawsuit and signed irrevocable waiver[s] and releases of their FLSA claims."[23]  According to Grand Isle, "[a]ny potential class plaintiffs who signed releases are not similar" to Sandlin and thus should be excluded from the "Misclassification Class."[24]

"The general rule establishes that FLSA claims . . . cannot be waived." *Bodle v. TXL Mortg. Corp.*, 788 F.3d 159, 164 (5th Cir. 2015) (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945)).  To understand the contours of this rule, the foundational Supreme Court case concerning releases of one's FLSA rights, *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945), is instructive.

The petitioner in *Brooklyn Savings* "owned and operated an eleven story office building in which the respondent was employed as a night watchman during a two year period from November 5, 1938, to August 30, 1940."  324 U.S. at 699.

> Since a substantial portion of that building was devoted to the production of goods for commerce, the respondent was entitled to overtime compensation under the provisions of Section 7 of the [FLSA].  No such compensation was paid at that time.  However, in November, 1942, over two years after the respondent had left petitioner's service, the petitioner computed the statutory overtime compensation due the respondent and offered him a check for $423.16 in return for a release of all of his rights under the [FLSA].  The respondent signed the release and took the check.

---

[23] *Id.* at 5.
[24] *Id.* (emphasis removed).

*Id.* at 699-700 (internal citations omitted).  The respondent later instituted an action to recover liquidated damages under the FLSA.

The Supreme Court first considered "whether respondent's release was given in settlement of a bona fide dispute between the parties with respect to coverage or amount due under the Act or whether it constituted a mere waiver of his right to liquidated damages." *Id.* at 703.  After determining that "the release was not given in settlement of a bona fide dispute between employer and employee," the justices then turned to the key issue: "whether an employee, accepting from his employer a delayed payment of the basic statutory wages due under the [FLSA], can validly release and waive any further right to recover liquidated damages," a FLSA-secured right. *Id.* at 702-03.

A majority of the justices held that, "in the absence of a bona fide dispute between the parties as to liability," the written waiver did not bar an action to recover liquidated damages, because "the same policy considerations which forbid waiver of basic minimum and overtime wages under the [FLSA] also prohibit waiver of the employee's right to liquidated damages." *Id.* at 704, 707; *see also Martin v. Spring Break '83 Prods., L.L.C.*, 688 F.3d 247, 257 (5th Cir. 2012) ("We reiterate that FLSA substantive rights may not be waived . . ., however, here, FLSA rights were not waived, but instead, validated through a settlement of a bona fide dispute, which Appellants accepted and were compensated for."). Then, soon after *Brooklyn Savings*, the Supreme Court clarified that "even when there is a bona fide dispute as to whether certain employees are covered by the FLSA, and when that

dispute has been settled in favor of paying the employees FLSA required wages, the employees' right to recover liquidated damages cannot be waived." *Bodle*, 788 F.3d at 163 (discussing *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108 (1946)).

In light of the general rule against waiver, "many courts have held that, in the absence of supervision by the Department of Labor or scrutiny from a court, a settlement of an FLSA claim is prohibited." *Id.* at 164 (citing cases). One such court is the Eleventh Circuit, which addressed the issue in *Lynn's Food Stores, Inc. v. U.S. By & Through U.S. Department of Labor, Employment Standards Administration, Wage & Hour Division*, 679 F.2d 1350 (11th Cir. 1982).

*Lynn's Food Stores* centered on a company's attempt to use private settlements with its employees to neuter a Department of Labor investigation into its wage practices. *See* 679 F.2d at 1352 (explaining the case's factual background). After executing the settlements, Lynn's "brought [a] declaratory judgment action against the United States Department of Labor seeking a ruling that the employer was free from liability arising under the [FLSA]" as a result of the settlements." *Id.* at 1351-52.

Lynn's position was that "the circumstances in which its employees signed settlement agreements essentially duplicates the adversarial context of a lawsuit brought by employees to resolve a bona fide dispute over FLSA coverage." *Id.* at 1354. The Eleventh Circuit disagreed:

> Settlements may be permissible in the context of a suit brought by employees under the FLSA for back wages because initiation of the action by the employees provides some assurance of an adversarial context. The employees are likely to be represented by an attorney

12

who can protect their rights under the statute.  Thus, when the parties submit a settlement to the court for approval, the settlement is more likely to reflect a reasonable compromise of disputed issues than a mere waiver of statutory rights brought about by an employer's overreaching.  If a settlement in an employee FLSA suit does reflect a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute[,] we allow the district court to approve the settlement in order to promote the policy of encouraging settlement of litigation.  But to approve an "agreement" between an employer and employees outside of the adversarial context of a lawsuit brought by the employees would be in clear derogation of the letter and spirit of the FLSA.

*Id.*

The Fifth Circuit grappled with *Lynn's Food Stores* in *Martin v. Spring Break '83 Productions, L.L.C.*, 688 F.3d 247 (5th Cir. 2012).  In *Martin*, the Fifth Circuit approved "unsupervised settlements" of FLSA claims—that is, settlements of such claims outside the supervision of the Department of Labor or a court—"that are reached due to a bona fide FLSA dispute over hours worked or compensation owed." *Bodle*, 788 F.3d at 165 (citing *Martin*, 688 F.3d at 255).  The *Martin* Court reasoned that "such an exception would not undermine the purpose of the FLSA because the plaintiffs did not waive their claims through some sort of bargain but instead received compensation for the disputed hours." *Id.* (citing *Martin*, 688 F.3d at 257).

In the FLSA context, a bona fide dispute exists where evidence as to the number of hours worked or the amount of compensation owed is inconclusive. *See, e.g.*, *id.* at 164 ("In reaching the conclusion that a bona fide dispute existed [in *Martin*], we emphasized the union representative's inability to 'determine whether or not Appellants worked on the days they claimed they had worked[.]" (internal

quotation marks omitted) (alteration in original in part)).[25] Thus, the exception to the general rule against waiver of FLSA claims that the Fifth Circuit recognized in *Martin* appears premised on the assumption that some "factual development of the number of unpaid overtime hours [or] of compensation due for unpaid overtime" has taken place. *Id.* at 165.

Distinguishing *Lynn's Food Stores*, the *Martin* Court pointed out that *Lynn's Food Stores* concerned a settlement of FLSA claims "outside of the adversarial context of a lawsuit." *Martin*, 688 F.3d at 256 n.10 (quoting *Lynn's Food Stores*, 679 F.2d at 1354). In contrast, the employees involved in *Martin* "were already benefitting from legal counsel" before the settlement at issue was executed on November 3, 2009. *Id.* "In fact, [the employees] knew about their rights under the FLSA and had retained attorneys at least by July 9, 2009, the date that [their] attorneys signed their first amended complaint, filed with the Superior Court of California for the County of Los Angeles, for, among other things, 'overtime under

---

[25] In *Martin*, the Fifth Circuit adopted reasoning from *Martinez v. Bohls Bearing Equipment Co.*, 361 F. Supp. 2d 608 (W.D. Tex. 2005). *Bodle*, 788 F.3d at 163; *see Martin*, 688 F.3d at 255. The *Bodle* Court summarized *Martinez* as follows:

> In *Martinez*, the district court found a bona fide dispute as to hours worked and compensation owed where the release resulted directly from a complaint by the plaintiff that he had not been paid for his overtime work for a period of two years. Each party presented evidence of compensation owed, but the evidence was inconclusive. Due to the lack of conclusive evidence, the district court determined that there was a bona fide dispute as to liability. Therefore, the settlement document was enforceable.

*Bodle*, 788 F.3d at 163 (internal citations omitted).

14

the FLSA.'"  *Id.*  Thus, according to the *Martin* Court, the settlement "did not occur outside the context of a lawsuit" and so "the concerns that the Eleventh Circuit expressed in *Lynn's Food Stores* [were] not implicated."  *Id.*

In this instance, Grand Isle contacted current and former Life Representatives via mail about two months after Sandlin initiated this case.[26]  The cover letter that Grand Isle sent to these individuals provided, in relevant part:

> To put it briefly, [Grand Isle] believes it paid you fairly, well, and lawfully for your service.  A former employee of [Grand Isle] disagrees with their pay arrangements and has filed a lawsuit in an attempt to receive additional overtime pay.  He has styled his lawsuit as a collective action and may try to contact you to see if you want to join in.
>
> We are extending you an opportunity to receive some money from us now in exchange for agreeing not to participate in this lawsuit and releasing your claims as described in the documents included with this letter.[27]

Along with this letter, Grand Isle also sent the Life Representatives a settlement agreement.  The agreement further emphasized that Grand Isle denied all liability, but would nevertheless provide compensation to any eligible individual who

> releases *any and all claims* against [Grand Isle] *for any and all rights he or she may have under the FLSA,* including but not limited to recovery of unpaid wages, overtime compensation, liquidated damages, attorneys' fees, failure to maintain accurate payroll records, and failure to pay all wages due and owing at time of termination of employment.[28]

---

[26] *See* R. Doc. No. 50-1, at 1.  The Court points out that it was unaware that Grand Isle had taken the step of contacting these individuals with a settlement offer until it received and reviewed the briefing with respect to the present motion.
[27] *Id.* at 3.
[28] *Id.* at 8 (emphasis added).

In other words, despite Grand Isle's representation to the Life Representatives in the "Acknowledgement [o]f Settlement Offer" form that accompanied the settlement agreement that the agreement only "contains a release of any claims that are alleged in the Sandlin Lawsuit,"[29] the plain language of the agreement's release provision encompassed *all possible* FLSA claims that a Life Representative may possess against Grand Isle, regardless of whether those claims relate to the allegations made in Sandlin's case.

The compensation that Grand Isle offered the Life Representatives in exchange included an amount "attributed to overtime wages allegedly owed and not paid going back two years from December 20, 2017," as well as an amount "for alleged judicial interest."[30]  According to an affidavit executed by Bryan Pregeant ("Pregeant"), Grand Isle's Executive Vice President, "[t]he documents provided to current and former '[L]ife [R]epresentatives' were identical except for the specific dollar amounts" offered.[31]  Pregeant's affidavit further states that, of the thirteen Life Representatives employed by Grand Isle since October 3, 2014, eight executed the agreement.[32]

---

[29] *Id.* at 4.

[30] *Id.* at 9.

[31] *Id.* at 1.

[32] *Id.* at 2; *see also id.* at 13-26 (executed agreements).  The Court notes that the cover letter included with the agreement is dated December 13, 2017.  *Id.* at 3. Grand Isle required Life Representatives to decide whether to execute the agreement by December 31, 2017, less than three weeks later.  *Id.*  The Court further points out that this period of time coincided with the holiday season, when money is often tight and stress often high.

This agreement and the context in which numerous Life Representatives allegedly executed the agreement is problematic in multiple respects.  First, the overtime compensation that the agreement offered did not "give[ ] [Life Representatives] everything to which they [were allegedly] entitled under the FLSA at the time the agreement[s] [were] reached."  *Thomas v. Louisiana*, 534 F.2d 613, 615 (5th Cir. 1976).  The plain terms of the agreement indicate that the compensation only covered "overtime wages allegedly owed and not paid going back two years from December 20, 2017," plus judicial interest.[33]  As such, the earliest period for which the agreement alleges to have provided overtime compensation to Life Representatives was December 20, 2015.

Yet Sandlin is seeking overtime compensation for "'Life Representatives' who were misclassified from October 2014 through April 2016."[34]  Applying the FLSA's statute of limitations and rules governing the commencement of any individual claimant's case[35]—and so considering only the three years prior to the date of this

---

[33] *Id.* at 9.

[34] R. Doc. No. 42-2, at 6.

[35] FLSA violations are normally subject to a two-year statute of limitations.  *Ramos v. Al-Bataineh*, 599 Fed. App'x 548, 551 (5th Cir. 2015) (citing 29 U.S.C. § 255(a)).  However, "[t]he statute of limitations is extended to three years for willful violations of the FLSA."  *Id.*  Regardless, in the case of a collective action under the FLSA, an action is not considered "commenced in the case of any individual claimant" until the claimant's "written consent is filed in the court in which the action was commenced," unless the claimant "is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed" at the time the complaint is filed.  29 U.S.C. § 256.

"To prove a willful violation" of the FLSA for purposes of the three-year statute of limitations, "the plaintiff must establish that 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute.'"  *Ramos*, 599 Fed. App'x at 551 (quoting *McLaughlin v. Richland Shoe*

opinion[36]—one then finds that the agreement does not cover about half a year, from May 2015 to December 2015, for which Life Representatives may be able to recover damages under the FLSA. In short, "there is no guarantee that the [Life Representatives who executed the agreement] have been or will be compensated for the overtime wages they are allegedly due under the [FLSA]." *Bodle*, 788 F.3d at 165.

Further, like the employer in *Brooklyn Savings*, Grand Isle allegedly "computed the statutory overtime compensation due" to its current and former Life Representatives—or, more accurately, the compensation due for a specific two-year period—and offered each of them that compensation "in return for a release of all of [their] rights under the" FLSA. *Brooklyn Savings*, 324 U.S. at 700. Prior to these Life Representatives "sign[ing] the release and [taking] the check[s]" offered by Grand Isle, it appears that "there was no discussion or dispute" between them and Grand Isle "either as to the existence of liability under the [FLSA] or as to the amount of such liability." *Id.* at 700, 703 n.12. It also appears that Grand Isle did not provide these Life Representatives with any opportunity to conduct discovery to

---

*Co.*, 486 U.S. 128, 133 (1988)). "The three-year statute of limitations may apply even when the employer did not knowingly violate the FLSA; rather, it may apply when it simply disregarded the possibility that it might be violating the FLSA." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1324 (11th Cir. 2007). "If an employer acts unreasonably but not recklessly in determining its legal obligation under the FLSA, then its actions should not be considered willful and the two-year statute of limitations should be applied." *Id.*

[36] The Court is not deciding at this time whether the two-year or the three-year statute of limitations applies in this case. *See Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1043 (5th Cir. 2010) (noting that the district court's conclusion that a violation of the FLSA was "willful" is a finding of fact).

determine whether the amount of compensation that Grand Isle was offering was fair.  Indeed, it does not even appear that Grand Isle explained to them how it calculated the offered compensation.

Simply put, Grand Isle approached its current and former Life Representatives with a take-it-or-leave-it offer void of any semblance of negotiation: if you agree not to sue us under the FLSA, which you may not have known you had potential grounds to do, then we will cut you a check for some sum of money that we do not believe that we owe you and you may not have known that we may owe you, but that we would rather pay you than face you in court.  In light of these circumstances, the Court concludes that "the release[s] [were] not given in settlement of a bona fide dispute between employer and employee," *id.* at 703, but instead operated to "waive [FLSA] claims through some sort of bargain," *Bodle*, 788 F.3d at 165.  "[T]he Supreme Court has concluded that the FLSA forbids waiver of the right to statutory wages or to liquidated damages."  *Id.* at 163.

Moreover, Grand Isle approached these Life Representatives outside the confines of the adversarial process,[37] and it did so with what appears to have been the purpose of dissuading them from engaging in the adversarial process.  *See Lynn's Food Stores*, 679 F.2d at 1354 ("[T]o approve an 'agreement' between an employer and employees outside of the adversarial context of a lawsuit brought by the employees would be in clear derogation of the letter and spirit of the FLSA."); *cf.*

---

[37] Although Sandlin had commenced this case at the time that Grand Isle contacted the Life Representatives, the Life Representatives had not yet joined Sandlin's case, and thus the contact between Grand Isle and the Life Representatives took place outside of the confines of the adversarial process.

*Martin*, 688 F.3d at 256 n.10 (distinguishing *Lynn's Food Stores* on the ground that the settlement at issue "did not occur outside the context of a lawsuit"). The Court also notes that no evidence in the record indicates that any of the eight individuals who executed the agreement had consulted with counsel, or understood their rights under the FLSA, at the time of execution.[38] *See Lynn's Food Stores*, 679 F.2d at 1354 ("There is no evidence that any of the employees consulted an attorney before signing the agreements."); *cf. Martin*, 688 F.3d at 256 n.10 (noting that, unlike in *Lynn's Food Stores*, the employees involved in *Martin* "were already benefitting from legal counsel before the [s]ettlement [a]greement was signed").

For these reasons, the Court concludes that Grand Isle will not be able to enforce an executed agreement to prevent a Life Representative from joining this case.[39] As such, Grand Isle's argument that "[a]ny potential class plaintiffs who

---

[38] The agreement advised individuals to "consider consulting an attorney before agreeing to settle your claims." R. Doc. No. 50-1, at 4.

[39] In its opposition, Grand Isle points to the execution of these settlement agreements by numerous current and former Life Representatives to argue that "certification . . . would be futile," because "there is a demonstrable lack of interest and substantial lack of potential plaintiffs." R. Doc. No. 50, at 6. Because the Court concludes that the agreements are unenforceable, the Court is not convinced that conditional certification would not result in additional eligible individuals expressing interest in joining this case.

The Court also recognizes that Grand Isle, in a footnote, argued that it "reserve[d] its right to enforce the settlement agreement and release and to assert counter claims against any such plaintiff that has signed a release of barred claims against" it. *Id.* at 5 n.2. In the same footnote, Grand Isle asserted that it "is prepared to brief the Court on the issue of the enforceability of settlement agreements in the context of a[n] FLSA collective action," suggesting that it had not yet had an opportunity to fully brief the issue and wanted to do so. *Id.*

Yet Grand Isle raised the enforceability issue in the body of its opposition. It contended that the agreement constituted an "irrevocable waiver and release[ ] of [a putative class member's] FLSA claims," and thus that anyone who executed the

signed releases are not similar" to Sandlin for purposes of conditional certification fails.[40]

"The cases in which conditional certification has been granted or upheld are clear that the 'similarly situated' standard at the initial conditional certification stage is lenient, plaintiff's burden is not heavy, the evidence needed is minimal and the existence of some variations between potential claimants is not determinative of lack of similarity." *Prejean*, 2013 WL 5960674, at *5 (emphasis removed) (citing cases). This low bar for conditional certification is met here.

The Court will therefore conditionally certify a "Misclassification Class." However, the Court will amend Sandlin's proposed definition of this class to account for the longest possible statute of limitations that could apply to putative class members' FLSA claims: three years.[41]   Accordingly, the Court will conditionally certify this case as a collective action under 29 U.S.C. § 216(b) with respect to all current and former Life Representatives who worked for Grand Isle at any location throughout the United States between May 2015 (three years prior to the date of

---

agreement was not "similarly situated" to Sandlin for conditional certification purposes and should not receive notice of this case. *Id.* at 5.  In other words, Grand Isle put forward an argument to the Court that was dependent on the enforceability of the agreement.  Further, it in fact cited case law concerning the enforceability of FLSA settlements. *See id.* (citing cases).

Thus, the issue of the agreement's enforceability was properly before the Court.  To the extent that Grand Isle did not adequately brief the issue, it has only itself to blame.

[40] *Id.*

[41] *See supra* note 35.

this order) and April 2016 (the time at which Grand Isle ended the allegedly unlawful policy).[42]

## III.

"Section 216(b) [of the FLSA] imparts the district court with discretionary authority to facilitate notice to potential plaintiffs." *Lima*, 493 F. Supp. 2d at 800; *see also* 29 U.S.C. § 216(b) ("An action to recover the liability prescribed in [certain sections of the FLSA] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."). Sandlin has submitted to the Court a proposed notice addressed to "Life Representatives who worked for Grand Isle Shipyard, Inc. at any time from 3 Years Before [Date of order granting class certification] to present at any location throughout the United States."[43] The proposed notice explains, *inter alia*, the existence of this case and the right to opt-in to the collective action.[44] It also states that anyone who executed a settlement agreement with Grand Isle may nonetheless participate in the case.[45]

Grand Isle objects to the proposed notice on two grounds. First, Grand Isle argues that "[t]he notice should include a statement informing putative class members that if they opt-in to the class they will be subject to obligations involved

---

[42] Both plaintiff's counsel and defense counsel orally agreed with the Court's revised definition of the proposed "Misclassification Class."

[43] R. Doc. No. 40-10, at 2 (emphasis removed) (capitalization and bracket in original).

[44] *See id.* at 2-3.

[45] *Id.* at 2.

in litigating claims, such as responding to discovery, testifying at a deposition, trial or hearing and paying costs if they do not prevail."[46]  The Court concludes that the inclusion of this information in the notice is not necessary.  As Sandlin points out, "representative discovery and testimony is frequently permitted in FLSA collection action[s]."[47]  *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016) (noting that, "[i]n FLSA actions, inferring the hours an employee has worked from a study . . . has been permitted by the Court so long as the study is otherwise admissible").  Thus, it is far from clear that such obligations will in fact fall on the shoulders of putative class members.  In addition, Sandlin has indicated that his counsel "has agreed to bear the costs associated with the case in the event the plaintiffs do not prevail."[48]

Grand Isle also argues that "the proposed notice submitted by [Sandlin] is [ ] biased, argumentative, and contains untrue statements."[49]  Grand Isle then points to two statements with which it takes issue:

- "If you signed a settlement with Grand Isle, you may participate in this case."[50]

- "Federal law prohibits Grand Isle from terminating your employment, or in any other manner discriminating or retaliating against you for taking part in this case or otherwise exercising your rights to unpaid wages under federal law.  It is Grand Isle's policy not to retaliate against anyone making a claim for unpaid wages."[51]

---

[46] R. Doc. No. 50, at 11.
[47] R. Doc. No. 51, at 9.
[48] *Id.*
[49] R. Doc. No. 50, at 12.
[50] R. Doc. No. 40-10, at 2.
[51] *Id.* at 3.

Despite Grand Isle's protestations to the contrary, these statements do not "lack the requisite neutrality" and thus the Court will not require Sandlin to excise them from his proposed notice on this basis.[52]

Although the Court rejects Grand Isle's objections to Sandlin's proposed notice, the Court will, for the sake of clarity, require Sandlin to modify the beginning of the first objected-to statement to read as follows: "Even if you signed a settlement with Grand Isle, you may participate in this case."  The Court will also require Sandlin to amend his order to reflect the Court's definition of the "Misclassification Class."  Only individuals who meet this definition should receive the notice.

## IV.

For the foregoing reasons,

**IT IS ORDERED** that Sandlin's motion for conditional certification is **GRANTED IN PART** and **DENIED IN PART**.  With respect to Sandlin's proposed "Misclassification Class," the motion is **GRANTED**.  With respect to Sandlin's proposed "Off-the-Clock Class," the motion is **DENIED**.

**IT IS FURTHER ORDERED** that the Court conditionally certifies this case as a collective action under 29 U.S.C. § 216(b) with respect to all current and former

---

[52] R. Doc. No. 50, at 13.  The Court notes the irony associated with Grand Isle's contention that these neutral statements "contain biased and argumentative verbiage," given that the letter that Grand Isle sent to current and former Life Representatives in response to Sandlin's initiation of this case contained language of just that sort.  *Id.*; *see* R. Doc. No. 50-1, at 3 (letter from Grand Isle to current and former Life Representatives).

Life Representatives who worked for Grand Isle at any location throughout the United States between May 2015 and April 2016.

Grand Isle shall provide Sandlin's counsel with the names, positions, dates of employment, all personal addresses, telephone numbers (home and mobile), and all personal email addresses for the class members ("class list"). Grand Isle shall provide such information in a format, to be agreed upon by the parties, within **ten (10) days** of the date of this order.

Sandlin shall amend his proposed notice as set forth herein. Sandlin's counsel shall mail a copy of the amended "notice of rights" and "consent form" via regular U.S. Mail and via electronic mail to all persons contained on the class list within **ten (10) days** of receiving the class list. Simultaneous with the first mailing, Sandlin's counsel shall send a text message to the class members with a link to the notice of rights and consent form.

**Thirty (30) days** after the first mailing, Sandlin's counsel shall send a reminder notice consisting of the notice of rights and consent form via mail, email, and text message to all class members who have not opted into this case. Class members shall also be given the option to execute their consent forms electronically online.

All consent forms shall be returned to Sandlin's counsel, who in turn will be responsible for filing them with the Court.

Class members shall have **sixty (60) days** from the date of the mailing of the notice to file their notice of consent opting-in to this lawsuit as plaintiffs, unless good cause is shown to merit extending the deadline.

New Orleans, Louisiana, May 3, 2018.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**